IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LEAH M. POWLEY,<br><br>                    Plaintiff,<br><br>        vs.<br><br>RAILCREW XPRESS, LLC,<br><br>                    Defendant. | **4:19CV3058**<br><br><br>**MEMORANDUM AND ORDER** |

The plaintiff, Leah M. Powley, brings this action alleging claims of disability discrimination under both state and federal law. She alleges Defendant failed to reasonably accommodate her disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et seq.,* and the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 *et seq.* Powley's complaint also alleges Defendant retaliated against her for requesting accommodation for her disability in violation of the ADA and NFEPA. The defendant, Railcrew Xpress, LLC (RCX) has moved the court for summary judgment regarding all claims. (Filing No. 43). The court has carefully reviewed the record, the arguments of counsel, and the relevant case law. For the reasons stated below, the court will grant RCX's motion and dismiss Powley's complaint.

STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Garrison v. Dolgencorp, LLC, 939 F.3d 937, 941 (8th Cir. 2019), citing Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008); See Fed. R. Civ. P. 56(a). Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011)(en banc). In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of this suit. Quinn v. St. Louis County, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Torgerson, 643 F.3d at 1042.

BACKGROUND

Consistent with the court's local rules, only those facts cited, by page, in the parties' briefs were considered by the court in evaluating Defendant's pending motion. See NECivR 7.1(a)(2)(A) & (b)(2)(A). Those facts, assumed to be true for the purposes of this motion, are as follows:

RCX is a transportation company that contracts with railroads to transport railroad crews from one location to another. (Filing No. 44 at CM/ECF p. 3). RCX employs drivers to transport the crews and owns a variety of vans and SUVs assigned to drivers. (Id.) RCX operates 24 hours per day, seven days per week. RCX employs dispatchers, also known as starters, who work at the Fremont, Nebraska location, coordinating trips requested by the railroads. (Id.) One starter worked at a time, with a 10-15 minute overlap as one starter finished a shift and another began. (Filing No. 44 at CM/ECF p. 10). Full-time starters typically worked

12-hour shifts. Part-time starters worked 12-hour shifts if they filled in for full-time starters, but otherwise worked shorter shifts. (Filing No. 44 at CM/ECF p. 10, ¶ 63).

Drivers in Fremont and Lincoln are part of a union and subject to a collective bargaining agreement. Starters are not part of the union, are considered "management," and have a leadership role with some control over the duties, hours, and schedules of the drivers. (Filing No. 44 at CM/ECF p. 4, ¶¶ 10, 11).

When starters were allowed to return to driver positions, those who had worked as starters in the past were critical of the decisions the other starters made, informed drivers that the starters were not doing their jobs properly, or engaged in disruptive behavior. So, RCX instituted a rule prohibiting employees promoted to starter positions from returning to driver positions. (Filing No. 44 at CM/ECF p. 4, ¶¶ 12, 13[1]). The rule was not written but it was well-known and enforced. (Filing No. 44 at CM/ECF p. 4, ¶¶ 15, 16). Managers at RCX locations were instructed to inform drivers who moved to starter positions that they would not be permitted return to a driver position. (Filing No. 44 at CM/ECF p. 4, ¶ 14)

RCX has policies that prohibit discrimination on the basis of disability, and other protected categories. (Filing No. 44 at CM/ECF p. 5, ¶ 21). RCX's ADA policy states, in relevant part:

> Employees with a disability who believe they need a reasonable accommodation to perform the essential functions of their job must contact the Human Resources Department [by telephone]. Requests are not to be made to a supervisor or manager. Upon receipt of an accommodation request, the Human Resources Department will meet with you to discuss and identify precise limitations from the disability

---

[1] Paragraphs 12-16 of RCX's statement of undisputed facts are marked as disputed by Powley. Powley's clarifications as to the "no demotions" policy are incorporated in the court's summary of the facts.

and the potential accommodation that the Company might make to allow you to perform your job duties.

Individuals seeking an accommodation must cooperate fully with the process. This includes meeting with the Human Resources Department, supporting requests for medical information, including providing any required HIPAA consent and prov[id]ing relevant information to support the request.

(Filing No. 44 at CM/ECF pp. 5-6, ¶ 22)

In practice, if an employee provided medical documentation to a starter, the starter passed it to the manager, who sent it to Human Resources (HR). On some occasions starters provided documentation directly to HR. (Filing No. 44 at CM/ECF p. 6, ¶ 23). The manager then communicated with HR and gave feedback to the employee. (Filing No. 44 at CM/ECF p. 6, ¶ 24) At times managers facilitated sending documentation to HR, but ultimately HR processed all accommodation requests and determined whether RCX could accommodate the employee's request. (Filing No. 44 at CM/ECF p. 6, ¶ 26).

Powley is a resident of Nebraska and worked for RCX in Nebraska for approximately three years. (Filing No. 44 at CM/ECF p. 3, ¶ 1). She began working as a driver in July 2015. (Filing No. 44 at CM/ECF p. 6, ¶ 29). She received a copy of the RCX Handbook on July 10, 2015, and an updated version of the handbook in 2016. (Filing No. 44 at CM/ECF p. 7, ¶¶ 30, 31). She understood RCX's policy required employees to contact HR to request an accommodation. (Filing No. 44 at CM/ECF p. 7, ¶ 32) She provided three doctor's notes in 2016 indicating she should be off work from February 10 to March 3, 2016, and her request was accommodated. (Filing No. 44 at CM/ECF p. 7, ¶ 33)

In May 2016 she submitted a doctor's note excusing her from driving an Econo 350, a particular type of van, due to "aggravation of back pain." (Filing No.

44 at CM/ECF pp. 7-8, ¶ 38-40) Local management provided the note to HR, who approved the request. (Filing No. 44 at CM/ECF p. 8, ¶ 41).

Powley took FMLA leave beginning in August 9, 2017 to care for her husband. She spoke with RCX HR and provided supporting documentation. (Filing No. 44 at CM/ECF p. 8, ¶ 42-44). On October 6, 2017, Powley submitted a note that she would return but she would need to limit her hours to two days per week with 11 hours between shifts and no more than 10-hour shifts, and her request was accommodated. (Filing No. 44 at CM/ECF p. 8, ¶ 45-46). After she returned, Powley trained another driver and was told that only a Nissan van was available. Powley said driving the Nissan van hurt her back, but she did not have supporting documentation so she drove the van. (Filing No. 44 at CM/ECF p. 9, ¶ 47-48). On October 27, 2017, she visited her doctor and requested a note indicating she should not drive the Nissan van due to chronic back pain. (Filing No. 44 at CM/ECF p. 9, ¶ 50). HR approved her request. (Filing No. 44 at CM/ECF p. 9, ¶ 51).

On February 20, 2018 Powley visited her doctor requesting a note stating that she could not work more than ten hours at a time due to her back pain, and that her hours be between 7:00 p.m. and 7:00 a.m. so she could care for her husband during the day. (Filing No. 44 at CM/ECF p. 9, ¶ 52). The note provided to RCX states "work shifts no longer than 10 hours, no more than 5 days/wk, shifts between 7pm-7am." (Filing No. 44 at CM/ECF p. 9, ¶ 53). It contains no mention of back pain. Powley submitted her note to RCX and HR approved the request. (Id, ¶ 54). On March 2, 2018 Powley submitted a doctor's note stating she could not drive Suburban SUVs due to low back pain, and her request was approved by HR. Filing No. 44 at CM/ECF p. 9-10, ¶ ¶ 55-56).

On May 27, 2018 Powley was promoted to a part-time starter position, reporting to the Area Manager and/or the General Manager (Filing No. 44 at

CM/ECF p. 10, ¶¶ 57-58). At that time, Shalomi Meier, Tina Reins, and Louis Schulskump were full-time starters and Michelle Thayer was also a part-time starter. (Filing No. 44 at CM/ECF p. 10, ¶ 60) When she was a starter, Powley's direct supervisors were Susan Eitzen or Amy Armstrong. (Filing No. 44 at CM/ECF p. 10, ¶ 59) Powley's hours fluctuated; sometimes she worked fewer than 30 hours per week, and at times she worked more than 60 hours per week. (Filing No. 44 at CM/ECF pp. 10-11; ¶ 64).

A starter's main job was to coordinate and document trips requested by the railroad. (Filing No. 44 at CM/ECF p. 11, ¶ 67). The starters worked in an office inside a building owned by Union Pacific at the railyard in Fremont. (Filing No. 44 at CM/ECF p. 11, ¶ 72). Trains travel through the yard throughout the day. (Filing No. 44 at CM/ECF p. 12, ¶ 73). In approximately June 2018, Union Pacific moved RCX to a different office in the same building. (Filing No. 44 at CM/ECF p. 12, ¶ 75). RCX, as a rent-free tenant, was not in control of the office location within the building. (Filing No. 44 at CM/ECF p. 12, ¶ 76). The new office was noisier, so it was harder for the starters to hear the drivers. (Filing No. 44 at CM/ECF p. 12, ¶ 77).

If starters are busy, they cannot leave the depot. (Filing No. 44 at CM/ECF p. 11, ¶ 70). The job description indicates that starters may occasionally have to cover a trip if no drivers are available, but Meier, Armstrong, and Thayer did not recall that ever happening. (Filing No. 44 at CM/ECF p. 11, ¶ 68). Starters can do their job standing or sitting, as they choose. (Filing No. 44 at CM/ECF p. 11; ¶ 70). Thayer estimated that during a typical 12-hour shift, there would be periods of downtime, in which she would file, walk outside, crochet, or read a book. (Filing No. 44 at CM/ECF p. 11, ¶ 71).

Powley visited her doctor on August 8, 2018 and reported having increased headaches, and that her work environment had aggravated the frequency of her headaches, which are "migrainous in nature according to her." (Filing No. 45-22). Her chart states "She would like a note stating that she can only work approximately 9 hours, as that seems to be the sweet spot where she ultimately does not struggle with the frequency of the headaches." (Id.) The doctor's note stated "Patient needs day shift work. No shifts more than 9 hours." (Filing No. 45-23 at CM/ECF p. 2). Powley emailed the note to Susan Eitzen, who forwarded it to Sandy Walker, in HR. Powley was asked how long these restrictions would be in place, and Powley's doctor's office faxed an updated note indicating Powley needed daytime hours of no more than nine hours per day for the next seven days. (Filing No. 45-24). Walker asked Eitzen whether RCX could accommodate Powley's request, and Eitzen responded that Powley had not agreed to the hours given, which were on the weekend. (Filing No. 44 at CM/ECF p. 13, ¶ 90). The other starters changed their schedules to accommodate Powley's requests. (Filing No. 44 at CM/ECF p. 13-14, ¶ 91).

On August 15, 2018, Powley's doctor provided another note, extending the restrictions, noting that the daytime hours were "due to home situation," and stating that he would recheck Powley in two months. (Filing No. 45-27). Powley submitted the note to Eitzen, who forwarded it to Walker. (Filing No. 45-28). Walker inquired whether Eitzen could accommodate those hours, and Eitzen responded that Powley's inability to work at night made scheduling difficult, but Powley would be called in, as needed within those restrictions. (Filing No. 45-28).

Powley asked Amy Armstrong for more hours, and was told she needed updated documentation from her doctor. (Filing No. 44 at CM/ECF p. 14 ¶ 95). Powley visited her doctor on September 18, 2018. Her medical chart indicates she requested a note stating that she could work 12-hour shifts, but no less than 11

hours apart. She said "this would set up her schedule in a way that is much more tolerable to her and will allow her more flexibility at work." ([Filing No. 45-30](#)). She reported no chest pain, shortness of breath, palpitations, headaches, dizziness, or other complaints. ([Id.](#)) A new note was written stating she could work 12 1/2 hours per day with at least 11 hours in between. ([Filing No. 45-31](#)) It did not include a reason for the restrictions. The note was provided to Armstrong, who sent it to HR.

On September 27, 2018, Powley reported for her shift and found that one of the marker boards used to keep track of drivers, vehicles, and vehicle maintenance had been moved. Powley, who is left-handed objected to the placement of the board because it was more difficult for her to write on the board in that location. ([Filing No. 44 at CM/ECF p. 15](#) ¶¶ 99-102). She discussed the board placement with Reins, the other starter who was present. Powley testified "I knew right there and then that I was not going to get accommodated about it because they had already refused before about moving the desk. And I told her I was done; I was leaving." ([Filing No. 48-5 at CM/ECF p. 30](#)).

> The next morning, Powley sent an email to Armstrong and Eitzen stating:
>
> I have mentioned this before, but the noise in that office is horrible. It interferes with my ability to perform my duties as a dispatcher/start.
>
> Then there's the location of the desk and dry eraser boards. I am left handed. I asked several times about getting the desk put in another spot. Therefore, the dry eraser boards would be in a place convenient for all Dispatchers/Starters allowing for optional accessibility to all.
>
> Everytime I asked I was told it was staying this way. It's therefore why I no longer can be a dispatcher/starter. I have asked to go back to driving full time. You say per company policy I can't go back to driving full time.
>
> I have expressed my interest in the lead driver position. I have not heard anything further regarding the position.

I came to work today but left due to the issues in the office as stated above in this email. I also still have severe stomach pain for which I must go to the doctor.

I don't wish to leave RCX, I just am unable to be inside the office as a dispatcher/starter.

([Filing No. 45-32](#))

Powley filed her complaint on June 18, 2019, alleging "an impairment to her lower back that prevents or impairs her from doing major life activities of lifting, walking and sitting." Powley's back pain prevents her from sitting or standing for long periods of time, so she alternates between the two. ([Filing No. 44 at CM/ECF p. 16](#) ¶ 107). She also alleges she suffers from migraine headaches that affect major life activities of seeing and concentrating. ([Filing No. 1](#)) Her headaches are more frequent if her back hurts. ([Filing No. 44 at CM/ECF p. 16](#) ¶ 107). She gets migraines three to four times per year unless she is in a setting where the light is bad, the noise is extreme, or she is standing or sitting for extended periods of time. ([Filing No. 44 at CM/ECF pp. 16-17](#) ¶ 110). Powley does not estimate how often she got migraines while working at RCX, but she asserts that they were bad enough that she sought treatment and an accommodation for them in August 2018. ([Filing No. 48 at CM/ECF p. 6](#)).

ANALYSIS

I.      Failure to Accommodate

As noted above, Powley alleges that RCX engaged in discriminatory and retaliatory conduct in violation of the ADA and NFEPA. RCX has moved for summary judgment on all of her claims. Disability discrimination claims under the

NFEPA and the ADA are analyzed within the same framework. Moriss v. NSF Ry. Co., 817 F.3d 1104, 1106 (8th Cir. 2016).

> To prevail on a failure-to-accommodate claim, a plaintiff must first make a facial showing that [she] has an ADA disability and that [she] has suffered [an] adverse employment action. Then [she] must make a facial showing that [she] is a qualified individual. When the employee has made [her] facial showing, [t]he burden then shifts to the employer to show that it is unable to accommodate the employee.

Carlentine v. Duggan, No. 8:19CV251, 2020 WL 1820129, at *2 (D. Neb. Apr. 10, 2020), citing Gardea v. JBS USA, LLC, 915 F.3d 537, 541 (8th Cir. 2019).

1. Disability

The ADA is applicable to individuals who suffer an adverse employment action "because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). To 'substantially limit' a major life activity means to render an individual unable to perform a basic function that the average person in the general population can perform, or to significantly restrict as to the condition, manner, or duration under which an individual can perform a major life activity as compared to an average person in the general population. 29 C.F.R. Pt. 1630, App. § 1630.2 (j).

Powley suffered from lower back pain and migraines, which can be impairing. Powley also asserts she suffers from migraines and the noise, lights, and glare in the train depot interfere with her ability to concentrate. Citing Carlson v. InaCom Corp, 885 F.Supp 1314 (D. Neb. 1995), Powley argues she has a disability as that term is defined under the ADA. Carlson recognized that migraine

headaches can constitute a "disability" if the headaches are debilitating, rendering the plaintiff unable to care for a child, drive a car, or concentrate on work.

Here, Powley recalled only one instance in which she had a migraine while at work at RCX and when that occurred, she was able to continue working. She could not recall leaving work due to a migraine. The facts of this case are therefore clearly distinguishable from Carlson.

Even assuming there is sufficient evidence in the record to create a genuine issue of material fact as to whether Powley is disabled under the ADA, there must be sufficient evidence that she could perform the essential functions of the job, that she requested accommodation, and that the requested accommodation was reasonable.

2.  Qualified Individual

In order to show that she is a qualified individual under the ADA, Powley must prove that she was able "to perform the essential functions of the position, with or without reasonable accommodation." Gardea, 915 F. 3d at 541, citing Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013) (quotation omitted); 42 U.S.C. § 12111 (8). Essential functions of the position are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "Essential functions are the fundamental duties of the job, but not its marginal functions." Kowitz v. Trinity Health, 839 F.3d 742, 745 (8th Cir. 2016). Factors to be considered when assessing the fundamental duties of the job include: the functions the employer finds essential, functions described in a written job description, the time the employee is expected to spend performing the functions, the consequences of the functions not being performed, and whether other employees in similar jobs perform the same functions.

Powley asserts she was able to satisfactorily perform both the starter and driver jobs. She argues that she requested an accommodation, and RCX was obligated to work with her in a good faith manner to accommodate her alleged disability. For the purposes of this motion, I find there is sufficient evidence that Powley was able to perform the essential functions of her position.

### 3.  Alleged Accommodation Requests

The ADA places the initial burden on the employee to request accommodation. Ballard v. Rubin, 284 F.3d 957, 960-61 (8th Cir. 2002). Only then must the employer engage in the interactive process to attempt to find a reasonable accommodation. Id. A request for accommodation need not be in writing or use "the magic words 'reasonable accommodation,' " but it "must make clear that the employee wants assistance *for his or her disability*." Id. at 962 (emphasis added). In the usual case, a disabled employee requests a reasonable accommodation to allow her to perform the essential functions of her job. See Burchett v. Target Crop., 340 F.3d 510, 517 (8th Cir. 2013). Lipp v. Cargill Meat Solutions Corp., 911 F.3d 537, 546 (8th Cir. 2018)(an individual requesting an accommodation must show that the accommodation will allow her to perform the essential functions of the job).

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." Dropinski v. Douglas Cty., Neb. No. 8:00-CV-313, 2001 WL 1580201, (D. Neb. Dec. 5, 2001) citing 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations may include "job restructuring, part-time or modified

work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustments or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." 42 U.S.C. 12111(9)(B). However, an employer cannot be required to "change the essential nature of the job." Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1218 (8th Cir. 1999).

Plaintiff asserts RCX failed to accommodate her by: (a) failing to provide her an ergonomic chair; (b) failing to move the starter desk to reduce glare on the computer screen; and (c) failing to allow her to return to a driver position. (Filing No. 44 at CM/ECF p. 18 ¶ 113; Filing No. 48 at CM/ECF p. 6 ¶ 189). RCX asserts Powley cannot prove that she informed RCX that an accommodation was needed to address the alleged disabilities. (Filing No. 44 at CM/ECF p. 26, citing Dropinski v. Douglas Cty., Neb., No. 8:00-CV-313, 2001 WL 1580201, (D. Neb. Dec. 5, 2001) ("[I]t is the responsibility of the individual with the disability to inform the employer that an accommodation is needed.")

a.  The Chair

Powley asked Meier and Eitzen for a different chair, because one of the chairs in the office was broken and the other was not in good condition. (Filing No. 44 at CM/ECF p. 17 ¶ 114-115). She told Eitzen that the chair was hurting her back. (Filing No. 44 at CM/ECF p. 17 ¶ 116). Sometimes starters brought in their own chairs. Powley brought her own chair for a time, but took it home when she learned that others were also using it. (Filing No. 44 at CM/ECF p. 18 ¶ 121, Filing No. 45-1 at CM/ECF p. 33).

Eitzen and Powley agree that Powley complained one time about the chair. Powley testified that she was told "no other chair would be bought." (Filing No. 45-

1 at CM/ECF p. 33). Powley said she mentioned the chair "a couple other times, 'You know, it'd be really nice to get another chair,'" but her comments did not get the desired response. (Filing No. 45-1 at CM/ECF p. 34). Eitzen's declaration states Powley never told her that she needed a different chair for a medical reason. (Filing No. 45-35). Other than the conversation with Eitzen, Powley talked to Meier and Reins, two other starters, about the chair.

Walker's declaration states that Powley did not ask RCX HR for a chair or provide documentation indicating she needed a different chair for medical reasons. (Filing No. 45-2 at CM/ECF p. 6). Additionally, while Powley asserts that her headaches were serious enough that she sought treatment in August 2018, there is no evidence that she informed her employer of that fact until after this action was filed.

RCX company policy requires an employee to contact the Human Resources Department directly to request an accommodation, and specifically states "Requests are not to be made to a supervisor or manager." Nonetheless, it was also an accepted practice that an employee could provide medical documentation to a supervisor, who would then send the documentation to HR for an evaluation and possible accommodation. RCX argues that there are numerous instances during Powley's employment with RCX that she requested, and was provided, accommodation by providing notes from a doctor. (Filing No. 44 at CM/ECF p. 28). All the notes she provided which requested accommodation due to back pain were submitted to RCX while Powley was employed as a driver.

It is clear that Powley spoke to her coworkers about her dissatisfaction with the chairs in the starter office. It is also clear that she spoke to her supervisor about her dissatisfaction with the chairs available to her. However, there is no evidence that Powley requested that RCX provide an ergonomic chair as an accommodation

for an alleged disability (back pain) or because the current chair aggravated her back, causing migraines. The undisputed evidence shows that Powley did not use the accepted procedures in pursuit of a different chair, and she did not meet her burden to show that she put her supervisors or employer on notice that any accommodation was sought due to an alleged disability. RCX cannot be held responsible for failure to accommodate an employee who did not request an accommodation nor provide a reason that an accommodation was necessary. See Dropinski, supra.

      b.  The Desk

Powley asserts she asked for the reasonable accommodation of moving the starter desk "to reduce glare that was aggravating her migraine headaches." (Filing No. 1 at CM/ECF p. 2). There were two desks in the office, but one was used mostly for storage. All of the starters used the same desk to work. (Filing No. 45-1 at CM/ECF p. 25). Powley asked fellow starters, Meier and Reins if the desk could be moved, and they refused. (Filing No. 45-1 at CM/ECF p. 27). With Meier, Powley discussed moving the desk to reduce glare, and Meier suggested angling the monitor. (Filing No. 44 at CM/ECF p. 18, ¶ 124, Filing No. 45-7 at CM/ECF p. 91).

On September 27, 2018, Powley discussed moving the desk with Reins, because Powley did not like the position of the white board in relation to the desk. Reins said Powley should talk to Meier. (Filing No. 45-1 at CM/ECF p. 30).

The next day Powley sent an email to Eitzen stating, in part:

I am left handed. I asked several times about getting the desk put in another spot. Therefore, the dry eraser boards would be in a place convenient for all Dispatchers/Starters allowing for optimal accessibility to all. Everytime I

asked I was told it was staying this way. It's therefore why I no longer can be a dispatcher/starter.

(Filing No. 44 at CM/ECF p. 16).

Eitzen's declaration states that Powley had complained about the position of the desk, but Eitzen believed Powley objected to the position because she was left-handed. Eitzen stated that she was not aware that Powley wanted to move the desk due to a disability. (Filing No. 45-35). The undisputed evidence shows that Powley spoke to her coworkers about the position of the desk. Powley "thinks" she addressed moving the desk and the board with her supervisor, Eitzen, and she "might have even addressed that with Amy Armstrong" but she was not certain. (Filing No. 45-1 at CM/ECF p. 27). However, she did not provide a medical reason for requesting a change in the office setup. Further, when she emailed Eitzen she complained of the position of the desk relative to the white board because she is left-handed. Left-handedness is not a disability.

Powley did not talk to anyone in HR or provide any medical documentation supporting any alleged medical need to reduce the glare. (Filing No. 44 at CM/ECF p. 18-19, ¶ 129; Filing No. 48 at CM/ECF p. 7 ¶ 200). Based on her past experience, Powley was clearly aware of the accepted procedures to request an accommodation for an alleged disability, but she did not use those procedures and she did not put anyone on notice that she required an accommodation for an alleged disability. RCX did not violate the ADA by failing to accommodate Powley's request to move the starter desk because Powley did not make any such request to RCX management or HR.

c. Driver Position

On August 21, 2018, Powley sent Eitzen an email stating "May I please go back to driving full time? The noise volume in the new office is interfering with my ability to perform my duties appropriately as a dispatcher." (Filing No. 44 at CM/ECF p. 19, ¶ 130, Filing No. 45-29 at CM/ECF p. 2). Eitzen responded that she would need to speak with her boss. Powley also spoke to Armstrong about returning to a driver position. Powley told Armstrong that "she did not like dealing with the drivers, did not like the light in the office, and the noise gave her headaches." (Id.) She also said she wanted to work 40 hours per week. (Filing No. 45-36). Armstrong's declaration states Powley did not say anything that led her to believe Powley's request was an accommodation for any kind of disability. (Id.) Armstrong informed Powley that RCX policy does not allow starters to return to driver positions. (Filing No. 44 at CM/ECF p. 19 ¶ 135).

Powley's claim fails because she has not adduced sufficient evidence that she requested the transfer to a driver position as an accommodation for her disability, an essential element of her claim. Broadwater v. Minnesota Dept. of Human Services, 22 F.Supp. 3d 989, 997 (D. Minn. 2014), citing Ballard v. Rubin, 284 F.3d 957, 960-61 (8th Cir. 2002). Powley's complaints to Armstrong about the noise in the office do not specifically mention a corresponding medical disability. There is evidence that Powley said the noise gave her a headache, but no evidence that Armstrong was aware that the noise aggravated a specific medical condition, i.e. Powley's migraines, and there is insufficient evidence that these alleged headaches were disabling as that term is defined under the ADA..

In response to Powley's requests to be reassigned, Powley's supervisors followed an unwritten, but well-known RCX policy that once an individual is hired as a starter, they may not return to a driver position. Even reviewing the facts in the light most favorable to the nonmovant, (i.e. construing Powley's statement that the noise gave her headaches as a disclosure of a disability), there are legitimate,

non-discriminatory reasons for RCX's denial of Powley's request to return to a driver position. See Broadwater v. Minnesota Dept. of Human Services, 22 F.Supp. 3d 989, 997 (D. Minn. 2014). (employers are not "required to reassign a disabled employee to a position when such transfer would violate a legitimate, non-discriminatory policy.") Powley does not dispute Walker's declaration which states that RCX has had negative experiences when allowing starters to return to driver positions. (Filing No. 45-2 at CM/ECF p. 2)

Powley argues that there is a question of fact as to whether the "no demotion" policy applied to her. She argues there was competent evidence that Thayer, a part-time dispatcher had also been allowed to drive. Powley's testimony disputes this argument, as she testified that Thayer was allowed to drive and dispatch while employed as a part time driver, but when Thayer became a full-time starter, she was no longer allowed to drive. (Filing No. 45-7 at CM/ECF p. 6, Filing No. 48 at CM/ECF p. 2 ¶ 152).

It does not appear that Powley's claims for failure to accommodate include the possibility of promotion to a vacant, lead driver position, but for the sake of completeness, any such claim would also fail. The evidence shows that Powley inquired into returning to driving full time in an email dated August 21, 2018. She also stated that she had expressed an interest in the lead driver position in her email to Armstrong and Eitzen on September 28, 2018. (Filing No. 45-29 at CM/ECF p. 2; Filing No. 45-32) Lead drivers are responsible for vehicle maintenance, and handling problems that occur with the vehicles, such as accidents and breakdowns. They also take trips if other drivers do not show up when they are called. (Filing No. 44 at CM/ECF p. 5 ¶ 17). For these reasons, lead drivers must be available to work at any time. (Filing No. 44 at CM/ECF p. 5 ¶ 18; Filing No. 45-7 at CM/ECF p. 9).

Powley had previously provided medical documentation limiting the hours she was available to work. She had also taken time off under FMLA to care for her husband. When she returned to work, she provided to RCX notes from her doctor stating that she needed specific working hours so she could care for her husband. Powley's inability to work certain hours of the day rendered her unable to perform the essential function of the lead driver position of working in an on-call capacity. To accommodate her request to shift to a lead driver position would require restructuring of the job, placing an undue burden on RCX. This request is unreasonable as a matter of law. No reasonable jury could find that Powley was a qualified individual for the lead driver position because she was unable to perform the essential functions of the job with or without accommodation.

The court finds when the record is taken as a whole, no rational trier of fact would find that Powley is entitled to relief under the ADA or NFEPA regarding a claim of discrimination or her decision to terminate her employment with RCX.

4. Adverse Employment Action

Powley does not specifically contend or argue that she suffered an adverse employment action. To the extent that Powley argues that the failure to accommodate her alleged disabilities was the adverse employment action, this argument fails for the reasons stated above.

Powley was not terminated from her employment at RCX. In her complaint, she alleged that she "was constructively discharged from her employment on September 27, 2018." (Filing No. 1). "Constructive discharge occurs 'when an employer deliberately makes an employee's work environment so intolerable that resignation is the employee's only plausible alternative.'" Cosby v. Steak N Shake, 804 F.3d 1242, 1246 (8th Cir. 2015) (quoting Williams v. City of Kansas City, Mo.,

223 F.3d 749, 753 (8th Cir. 2000)). Proof of a constructive discharge requires Powley to adduce evidence showing that (1) a reasonable person in Powley's situation would find the working conditions intolerable, and (2) that RCX intended to force Powley to quit or could reasonably foresee that its actions would cause her to quit. Richard v. Swedish Match N. Am., Inc., 773 F.3d 181, 186 (8th Cir. 2014). Whether Powley's working conditions at RCX were intolerable is viewed from the perspective of a reasonable person to Powley's situation. Gartman v. Gencorp Inc., 120 F.3d 127, 130 (8th Cir. 1997), Also, if Powley resigned without giving RCX a reasonable opportunity to resolve her complaint, her discharge was not constructive. Cosby, 804 F.3d at 1246.

Based on the undisputed evidence, on September 27, 2018, Powley arrived at work to find that the marker board used by the starters had been moved. She addressed her concerns about the placement of the board with Reins, her coworker, and then concluded that she could no longer work under the conditions in the starter office. She complained to her supervisor by email, stating she was unhappy with the placement of the desk and marker board because she is left handed. But "[n]ot everything that makes an employee unhappy is an actionable adverse action." Montandon v. Farmland Indus. Inc., 116 F.3d 355, 359 (8th Cir. 1997).

The evidence shows that prior to September 27, 2018, Powley was unhappy with the arrangement of the office furniture, the placement of the marker boards, the chair she was provided, and the noise in the office. However, there is no evidence that RCX deliberately created an intolerable working condition. Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996) ("To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit."). RCX was not put on notice that Powley required an accommodation for an

alleged disability, and Powley's coworkers' alleged responses to Powley's complaints cannot be imputed to the company. Powley's brief in response to RCX's motion for summary judgment does not address her allegation of constructive discharge. Upon consideration of the facts, I find the claim of constructive discharge lacks merit.

## II.   Disparate Treatment

Powley's final paragraph in her response brief states:

**The facts also support a disparate treatment claim under the ADA:**

The facts supporting plaintiff's failure to accommodate claim would also support the fact that defendant did not follow their own policies in accommodating plaintiff's disability. Arguably they wrongfully applied their no demotion policy and did not consult with HR before not allowing the plaintiff to transfer back to a driving job. Failure to follow company policy is evidence of pre-text and pre-text supports discriminatory intent.

(Filing No. 48 at CM/ECF p. 18) (emphasis supplied, internal citations omitted). Powley did not plead a disparate treatment claim. Under the ADA, disparate treatment and the failure to make reasonable accommodations are wholly different claims. Becerra v. Bon-Ton Stores, Inc., 8:15-CV-239, n. 9 (D. Neb. March 31, 2017), citing Peebles v. Potter, 354 F.3d 761, 765-66 (8th Cir. 2004).

## III.   RETALIATION

Powley's complaint alleges she was retaliated against for engaging in one or more activities protected by the ADA and NFEPA. To establish a prima facie case of retaliation, a plaintiff must show that: (1) she was engaged in statutorily

protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. DePriest v. Milligan, 823 F.3d 1179, 1187 (8th Cir. 2016). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a non-retaliatory reason for the adverse employment action. Weber v. Cty. of Lancaster, No. 4:17-CV-3117, 2019 WL 1437004, at *6 (D. Neb. Apr. 1, 2019) citing Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006).

RCX argues Powley's retaliation claim fails as a matter of law, and further argues that the claim is waived because she does not address the retaliation claim in her response brief.[2]

Even assuming the claim was not waived, viewing the evidence in the light most favorable to Powley, her claim for retaliation fails. "RCX does not dispute that Powley engaged in protected activity when she provided medical documentation to request changes to her position and/or when she communicated with HR about those positions." (Filing No. 44 at CM/ECF p. 33). However, Powley's requests for a different chair, moving the starter desk and returning to a driver position were not protected activity as she did not request any of these accommodations through HR or her supervisors with the stated purpose of alleviating a disability.

A materially adverse employment action occurs when there is a tangible change in working conditions that produces a material employment disadvantage. Wagner v. Campbell, 779 F.3d 761 (8th Cir. 2015). This includes termination, cuts in pay or benefits, and changes that affect an employee's future career prospects,

---

[2] Defendant refers to NECivR 7.1(a)(1)(A) which states "A party's failure to brief an issue raised in a motion may be considered waiver of that issue." However, 7.1(a)(1)(A) is the rule which governs a moving party's supporting brief in support of a motion. The rule for a nonmovant's brief is NECivR 7.1(b).

but it does not include minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage. Id.

Powley has not presented any genuine issue of material fact on the issue of whether she suffered a material adverse employment action. Her only testimony regarding retaliation pertains to her coworkers' actions. In her deposition, Powley stated that Meier and Thayer refused to move the desk and made changes to the schedule in retaliation for Powley making accommodation requests. Her coworkers' refusal to move a shared desk is not an adverse employment action. The alleged retaliatory actions were undertaken by Powley's co-workers and cannot be attributed to RCX. As to Powley's claims for retaliation, RCX's motion for summary judgment should be granted as a matter of law.

## CONCLUSION

For the reasons stated above, the court finds insufficient evidence in the record to support Powley's claims. Accordingly,

IT IS ORDERED:

1. Railcrew Xpress' motion for summary judgment (Filing No. 43) is granted.
2. Powley's complaint is dismissed.
3. A separate judgment will be entered.

Dated this 18th day of December, 2020.

BY THE COURT:


_s/ Cheryl R. Zwart_
United States Magistrate Judge